OPINION
Plaintiff-appellant, Peter Calkins, appeals a decision of the Butler County Court of Common Pleas, Domestic Relations Division, terminating the parties' 27-year marriage and ordering him to pay spousal support to defendant-appellee, Barbara Calkins.
The parties were married in 1973 and have three children, Nathaniel, Amanda, and Julie. Nathaniel and Amanda are both emancipated. Julie, who was born in 1989, is autistic and functions only at the level of a four to five-year-old child. While Julie is partially mainstreamed at school, she requires a full-time aide while at school. Both parties testified that she requires constant supervision. Barbara also testified that while Julie can read and is very good verbally, it is unclear whether she will ever live independently. Julie does not have the ability to make decisions and judge things. While Barbara received a Bachelor's degree in speech and communications in 1971, following the parties' marriage in 1973, she stayed home to take care of their three children. Barbara testified that when she married Peter, he had custody of his two children from a previous marriage.
Peter has always been self-employed. During the majority of the parties' marriage, he was the owner of Dreamland Waterbeds. Although income tax returns from 1993 to 1996 indicate that he was earning approximately $100,000 a year, Peter testified that in reality he did not make that much as he inflated his income to save the company money. After the business began to decline, Peter sold it in 1997, netting $250,000. Peter put the proceeds in a bank account under his name only and used some of the proceeds to pay off marital debts. By the time of the July 2000 hearing before the magistrate, there was only $11,000 left in the account.
After selling Dreamland, Peter opened a pizza restaurant, but that business failed and Peter sold it. In October 1998, the parties bought a house in West Chester so that Julie could attend school in the Lakota School District. Peter used $27,000 of the Dreamland proceeds to pay for the down payment for the house. In November 1998, without warnings, Peter left the marital residence and moved into an apartment. That same day, Connie Adams, his girlfriend and co-worker, moved in with him. Peter gives her his paychecks which she deposits in her bank account with her paychecks, her bingo winnings, and her tips ($100 to $200 a week). Connie then pays their monthly expenses out of her bank account.
In February 1999, Peter purchased a bar, now known as Pete's Café, for $60,000. Peter used $25,000 of the Dreamland proceeds for the down payment, and another $12,000 to improve and clean the bar. The bar is open six days a week, from Monday through Saturday. While business is slow during the week, it is good on Fridays and Saturdays. In addition to Connie, Peter also employs a DJ (whom he pays $50 per weekday and $75 on Fridays and Saturdays), two bouncers (at $50 a night each), and a bartender (who is paid $5 an hour plus tips). Peter also pays a band $150 a week to play on Wednesdays. Although the bar "is a dump" in need of a "tremendous amount" of repairs and upkeep, Peter nevertheless pays a monthly rent of $1,800. While he agrees that the bar makes an average of $25,000 to $28,000 a month (about $300,000 in annual gross revenue), Peter stated he cannot afford to pay himself more than $300 a week (or about $15,000 a year) until "business picks up." Peter pays Connie $400 a week because she works longer hours and is responsible for the bookkeeping. Peter is confident that once he pays off an $18,000 balloon payment and a monthly computer debt of $461 in March 2001, his income will "go up about $1,000.00 a month." Peter stated that while he is earning less than Connie, he is building equity in the business. Peter testified that in light of his age (mid-fifties), a bad hip, and the fact that he "talk[s] too much and people don't like [him] talking," the bar was a better business move for him, especially since he is not sharing any equity growth with Connie.
Barbara testified that due to Julie's autism, it was difficult for her to find and maintain full-time employment because she was often called from work to come pick up Julie. For example, Barbara testified that she tried working at a day care center with the idea that Julie would attend the same center. Barbara also hoped she could work more hours. However, Barbara still received calls regarding Julie. Eventually, the center's director informed Barbara that it could not provide Julie with the type of care she needed and Barbara was forced to quit her job. Barbara currently works for the Lakota School District in the lunchroom at Julie's school, four hours a day, five days a week, at $8.17 an hour. Barbara does not receive a paycheck during the summer and when the school is closed for holidays and Thanksgiving, Christmas, and Spring breaks. Barbara believes her lunchroom job gives her the flexibility to care for Julie that no other job offers.
Barbara testified that she tried to find summer child care for Julie so that she could work during the summers. However, Barbara was unable to find affordable and/or suitable child care for Julie. With regard to her Bachelor's degree in speech and communications, Barbara estimated it would take her about three years on a part-time basis to become current in the area of speech pathology. Barbara estimated it would take her an additional three years to obtain her teaching certificate. Barbara admitted she had not looked into obtaining her teaching certificate or becoming certified as she did not know if she could work part time, go to school, study, and take care of Julie all at the same time.
By decision filed July 28, 2000, the magistrate found Peter to be voluntarily underemployed, imputed him an annual income of $75,000, and ordered him to pay Barbara $1,000 a month in spousal support as follows:
 I recommend child support be based on the following: I find that Mr. Calkins is underemployed at the current time as based on his past earning records. He has a history of earning in excess of $100,000.00 per year. He is in the process of building a new business which he thinks will eventually return him to the same earnings. I further find that in addition to being currently underemployed, he is also not accounting for all the cash receipts which he is receiving in his business. I find his practice of keeping the cash register drawer open and the removal of cash from the drawer on a regular basis, while may be [sic] acceptable practices to the IRS or the taxing authorities, that for purposes of child support I find that Mr. Calkins' income exceeds his claim of $15,000.00 — $20,000.00 a year and he should be earning at least $75,000.00 per year. Therefore, child support should be based on $75,000.00 per year for Mr. Calkins and minimum wage imputed to Mrs. Calkins at the present time for purposes of child support.
 I recommend child support be set at $775.00 per month effective August 1, 2000. Mr. Calkins shall pay by deduction order to a bank account.
* * *
 Spousal support: I find the parties have a marriage of 27 years, they had three children, two of whom are emancipated and the remaining child is a special needs child. Julie is autistic and ten years old. Both parties are in good health and in their early 50's. While Mrs. Calkins does have a four year college degree (earned in 1971), she has not used the degree or been employed outside of the home for the past 27 years. Mrs. Calkins is now working in a part time position in a school system which permits her to be available for Julia [sic] as needed. Mr. Calkins did not dispute Mrs. Calkins' claim that Julia [sic] does need constant care and attention.
 I find the parties had a comfortable, upper middle class lifestyle after 27 years of marriage. Mr. Calkins is now in the process of re-building a new business. He has voluntarily elected to remove himself from the marital home. He has been living with another woman and sharing expenses or supporting those expenses by his business venture for about two years.
 As indicated [above], I find that Mr. Calkins is underemployed. While I understand the concept of "lean years" in a new business, I also find that the cash and gross receipts running through this business are in excess of $300,000.00 annually. The evidence is clear and convincing that there is a substantial question as to the amount of cash available to Mr. Calkins for his use for daily expenses and his own living needs.
 In consideration of all the factors under ORC 3109.18
[sic], with emphasis, on the following: length of the marriage, earning capacity and disparity of the parties, requirements of Mrs. Calkins to care primarily for an autistic child and lifestyle, I recommend this Court retain continuing jurisdiction over the issue of spousal support and that * * *:
 Effective August 1, 2000, Mr. Calkins shall pay $1,000.00 per month in spousal support, terminable upon the death, remarriage or cohabitation of Mrs. Calkins.
 The amount of spousal support shall be reviewed within one year to determine if any increase is warranted.
Peter filed objections to the magistrate's decision, specifically to the income imputed to him and the spousal support obligation. By decision filed December 7, 2000, the trial court overruled Peter's foregoing objections. The trial court found that
 The real issue * * * is one of credibility. The Magistrate had the ability to view the witnesses as they testified and to believe or disbelieve any of those witnesses. The issue of credibility was within the Magistrate's sound discretion.
 The Court, after review of the trial transcript, cannot find the Magistrate erred in imputing income or making an award of spousal support.
The parties were divorced on May 9, 2001. This appeal follows in which Peter raises two assignments of error.
Assignment of Error No. 1:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF PLAINTIFF-APPELLANT WHEN IT HELD THAT APPELLANT WAS VOLUNTARILY UNDEREMPLOYED.
Peter argues that there was insufficient evidence for the trial court to impute him an annual income of $75,000 (or an amount three times his earning capacity) for purposes of calculating his child support and spousal support obligations.
In computing child support, a trial court must determine the annual income of each of the child's parents. For an unemployed or underemployed parent, income is the "sum of the gross income of the parent, and any potential income of the parent." R.C. 3113.215(A)(1)(a).[1] Potential income may therefore be imputed to an unemployed or underemployed parent. The question of whether a parent is voluntarily unemployed or underemployed is a question of fact for the trial court which will not be disturbed on appeal absent an abuse of discretion. Rock v. Cabral
(1993), 67 Ohio St.3d 108, 112. In determining whether the trial court abused its discretion, an appellate court may not substitute its judgment for that of the trial court. Briganti v. Briganti (1984), 9 Ohio St.3d 220,222.
Once a trial court determines that a parent is voluntarily unemployed or underemployed, the trial court may determine the parent's potential income. Rock at 111. Potential income represents the amount a parent would have earned if fully employed. R.C. 3113.215(A)(5)(a). In calculating potential income, a trial court must consider "the parents' employment potential and probable earnings based on the parent's recent work history, job qualifications, and the prevailing job opportunities and salary levels in the community in which the parent resides." Id.
After Peter was forced to sell Dreamland, he looked for other job opportunities. Peter summarily testified that he "tried to get in the field [he] was in before which is furniture." Peter, however, did not elaborate as to how seriously he tried to find a job in that field. Peter testified he considered a job at a car dealership where he could have earned $25,000 a year. However, he did not take the job because his expenses at that time were over $30,000. Peter also testified that following the sale of the pizza restaurant, he took a job at a Frisch's restaurant as an assistant manager trainee where he was earning about $350 a week. However, believing he had been misled as to the work hours and the potential income, he quit two or three weeks later. With no evidence that he had some or any experience in the bar business, and despite a bad hip and a personality he describes as offensive, Peter bought the bar in February 1999. Peter testified that the bar was a better business move for him. Peter is confident that the bar has much potential and that his income can vastly increase over the years, especially after he pays off the balloon payment and the computer debt in March 2001.
During the hearing before the magistrate, Peter agreed that the bar makes an average of $25,000 to $28,000 a month (about $300,000 in annual gross revenue). In addition to Connie, Peter also employs a DJ, two bouncers, and a bartender. Peter also pays a band $150 a week to play on Wednesdays. Although the bar "is a dump" in need of a "tremendous amount" of repairs and upkeep, Peter nevertheless pays a monthly rent of $1,800. Yet, Peter stated he cannot afford to pay himself more than $300 a week (or about $15,000 a year) until "business picks up." Barbara testified that following the parties' separation, Peter told her she would have to get assistance from the state. Barbara testified that when she told Peter the state would unlikely help her in light of his income, Peter replied "well, I'm self-employed I can show my income as whatever I would like."
Believing that Peter is not accurately accounting for his income, Barbara hired two private investigators to go to Peter's bar on various occasions to observe the amount of business. One investigator, Bryan Bogart, went to the bar on a Friday evening, the bar's busiest night. Bogart testified that between 8 and 10 p.m., he observed 65 to 70 beers and ten to 15 mixed drinks being served per hour. Bogart testified, however, that between 10 p.m. and 1 a.m., he observed 195 to 205 beers and 50 to 60 mixed drinks being served per hour. The other investigator, Angelo Cicero, Jr., went to the bar on three different occasions, including on a Friday evening. Cicero testified that he kept track of the number of beers and shots sold in his head, and that he did not pay close attention to the number of mixed drinks sold that Friday evening. Nevertheless, as the magistrate found, his tabulations mirror that of Bogart's as to the volume of beer and alcohol consumption in the bar.
Bogart also testified that the cash register drawer was left ajar several times during the evening, that while money was placed in the drawer, it was not always rung up, and that once the bar got busy later in the evening, the cash register drawer was left open more than it was left shut. Bogart testified he observed drinks not being rung up between ten and 20 times. Bogart also once observed Peter put a couple of dollars in his pocket instead of putting them in the drawer.
Connie admitted that they did not always ring all the drinks up. Connie explained that since the cash register is not programmed to take voids, if a drink is mistakenly rung up (also called an over ring), the next drink is not rung up. Connie asserted that except in the case of an over ring, all drinks are rung up. Connie also admitted occasionally putting cash from the drawer into her pockets, especially on busy nights in case the bar would be robbed. Connie testified that Peter sometimes puts money in his pockets when she has too much money in her pockets. For his part, Peter testified he only puts high denomination bills in his pockets when Connie is not there. Peter denied ever pocketing drink money. Peter also testified that the cash register drawer was always open. Peter explained that the drawer is left open because it takes too much time to ring up drinks on busy nights, and because it will not close when it has too many singles.
As already noted, Peter gives his paychecks to Connie who deposits them with her own paychecks in her bank account. Bank statements from Connie's bank presented during the hearing before the magistrate showed that some deposits made into the account were below what Peter and Connie claimed to be earning, while other deposits exceeded their earnings. Connie could not explain the difference between the amounts earned and the amounts deposited except that it possibly came from her tips and/or bingo winnings. Peter testified that he does not know what is deposited in Connie's bank account. In addition, while the bar's sales ledgers always indicated the total sales for each day the bar is open, it did not necessarily indicate how much money was deposited in the bank on some of the days. Connie could also not explain why the cash register tapes she had provided for any given day did not always match the deposited amounts as indicated in the sales ledgers.
Upon reviewing the record and the magistrate's decision, and in light of all of the foregoing, we find there is evidence supporting the magistrate's decision. We therefore find no abuse of discretion in the trial court's determination that Peter is voluntarily underemployed and in imputing him an annual income of $75,000 for the purpose of determining his child support and spousal support obligations. Peter's first assignment of error is overruled.
Assignment of Error No. 2:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF PLAINTIFF-APPELLANT WHEN IT ORDERED HIM TO PAY SPOUSAL SUPPORT IN AN AMOUNT AND FOR A DURATION THAT IS NOT SUPPORTED BY THE EVIDENCE.
The trial court ordered Peter to pay Barbara $1,000 in spousal support, terminable upon Barbara's death, remarriage, or cohabitation. Peter argues that such an award was an abuse of discretion because it did not set a definite termination date, did not take into consideration Barbara's significant assets, and was improperly based upon non-statutory factors.
A trial court is given broad discretion in determining whether an award of spousal support is appropriate. Holcomb v. Holcomb (1989),44 Ohio St.3d 128, 130-131. A trial court's decision to award spousal support will be reversed only if found to be an abuse of that discretion. Blakemore v. Blakemore (1993), 5 Ohio St.3d 217, 218-219. Likewise, the trial court is given wide latitude in determining the amount of spousal support to be awarded, as long as the trial court properly considers the statutory factors of R.C. 3105.18. Schneider v.Schneider (1996), 110 Ohio App.3d 487, 494. In setting forth its decision, the trial court must indicate its basis for the award in sufficient detail to enable the appellate court to properly review the award. Id.
R.C. 3105.18(C)(1) sets forth 14 factors a trial court must consider when determining whether to award spousal support, and if so, the amount and duration of the award. Those factors are:
(a) The income of the parties, from all sources * * *;
(b) The relative earning abilities of the parties;
 (c) The ages and the physical, mental, and emotional conditions of the parties;
(d) The retirement benefits of the parties;
(e) The duration of the marriage;
 (f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;
 (g) The standard of living of the parties established during the marriage;
(h) The relative extent of education of the parties;
 (i) The relative assets and liabilities of the parties * * *;
 (j) The contribution of each party to the education, training, or earning ability of the other party * * *;
 (k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;
 (l) The tax consequences, for each party, of an award of spousal support;
 (m) The lost income production capacity of either party that resulted from that party's marital responsibilities;
 (n) Any other factor that the court expressly finds to be relevant and equitable.
When a trial court indicates it has reviewed the appropriate statutory factors, there is a strong presumption that the factors were indeed considered. Babka v. Babka (1992), 83 Ohio App.3d 428, 435.
We first address Peter's argument that the trial court improperly failed to set a definite termination date for his payment of spousal support. While a spousal support award should, as a general rule, provide for the termination of the award within a reasonable time and upon a date certain, provided the payee spouse has the resources, ability and potential to be self-supporting, Kunkle v. Kunkle (1990), 51 Ohio St.3d 64,69, in cases involving a marriage of long duration, parties of advanced age, or a homemaker spouse with little opportunity to develop meaningful employment outside the home, a trial court may, in the proper exercise of its discretion, award spousal support terminable only upon certain contingencies. Id. at 68-69.
 Considering the facts of the case, including the 27-year duration of the parties' marriage, the current relative earnings abilities of the parties, Barbara's lost income production capacity as a result of her shouldering marital and parental responsibilities during the marriage, and the fact that as the custodian of an autistic child, she has little opportunity to develop meaningful employment outside the home, we cannot say that the trial court's decision to award spousal support to Barbara until her death, remarriage, or cohabitation amounts to an abuse of discretion.[2] See Goode v. Goode (1991), 70 Ohio App.3d 125
(epileptic child).
Peter also argues that the trial court improperly considered non-statutory factors to penalize him. We agree with Peter that some of the magistrate's findings probably were somewhat influenced by the magistrate's judgment of Peter's character and testimony. Indeed, the magistrate noted that Peter "voluntarily elected to remove himself from the marital home" and that he "has been living with another woman[.]" R.C. 3105.18(C) does not require a trial court to consider fault when awarding spousal support. Because the statute does not identify misconduct as a factor to be considered, it is discretionary for the trial court to determine whether such factor should be considered as "any other factor that the court expressly finds to be relevant and equitable" pursuant to R.C. 3105.18(C)(1)(n). See Taylor v. Taylor (Mar. 8, 2000), Guernsey App. No. 99-CA-34. While the magistrate referred to Peter's act of leaving the marital residence to live with Connie, the record clearly shows that the magistrate did not base its spousal support award solely upon this particular fact. Indeed, the spousal support award was based upon many of the factors set forth in R.C. 3105.18(C). We therefore find no abuse of discretion on the part of the trial court.
Finally, Peter argues that the spousal support award is unreasonable in light of the significant assets received by Barbara as a result of the divorce.
Pursuant to a mediation agreement, Barbara was awarded the marital residence while Peter was awarded his bar. The record shows that Barbara was also awarded the $11,000 balance of an IRA account originally held by Peter. The $11,000 balance is what is left from the $250,000 Dreamland proceeds. As already noted, the account was under Peter's name only. Peter testified that Barbara never had access to the account. Peter used $37,000 of the Dreamland proceeds for his bar.
The record also shows that in 1999, Barbara had a $21,000 certificate of deposit as well as a $77,000 money market account. It is undisputed that those accounts were Barbara's separate property and awarded to her as such. Barbara explained that the money was given to her by her mother to be earmarked for the parties' three children's education. Barbara testified it was her intention to divide the money between the children "with the bulk being saved for Julia, not knowing whether she will be able to live independently or not." Barbara admitted that while the money was not to be used for living expenses, she ended up using some of the money, with her mother's permission, for living expenses. The magistrate found, and the record supports such finding, that after Peter left the marital residence, Barbara, who was unemployed at the time, did not receive any substantial direct support from Peter.
While the magistrate did not explicitly consider Barbara's separate property in awarding her spousal support, the record clearly shows that Barbara was thoroughly cross-examined as to her separate property, her credit card debts, and her living expenses. The record also shows that while the sale of Dreamland netted $250,000, Peter only specifically accounted for $75,000 of the proceeds ($37,000 for the bar plus $27,000 for the marital house down payment plus the $11,000 balance). With regard to the remaining $175,000, Peter only testified that "[i]t was used to pay taxes on the sale of the business, to pay off the second mortgage on the home that we had to make payments on and to pay off retirement fund money."
A spousal support award is based upon all of the evidence presented to a trial court, not just on a few selected items. Upon thoroughly reviewing the record and the trial court's detailed decision, and based upon the presumption that the trial court considered the statutory factors, we find that the trial court's award of spousal support to Barbara is not so unreasonable, unconscionable, or arbitrary as to connote an abuse of discretion. Considering the 27-year duration of the parties' marriage, the current relative earnings abilities of the parties, Barbara's lost income production capacity as a result of her shouldering marital and parental responsibilities during the marriage, her difficulty in finding summer child care for Julie and thus summer employment, and the fact that as the custodian of an autistic child, she has little opportunity to develop meaningful and/or full-time employment outside the home, we cannot say that the trial court's decision to award $1,000 a month in spousal support to Barbara until her death, remarriage, or cohabitation amounts to an abuse of discretion. Peter's second assignment of error is overruled.
Judgment affirmed.
WALSH, P.J., and VALEN, J., concur.
[1] We acknowledge that R.C. 3113.215 was repealed effective March 22, 2001. See Am.Sub.S.B. No. 180. However, we must review the trial court's application of the law which existed at the time of the trial court's proceedings. The provisions of R.C. 3113.215 applicable to the case at bar have been replaced by R.C. 3119.01.
[2] We are mindful that in its May 2001 divorce decree, the trial court reserved jurisdiction only "to review the award of spousal support within one year to determine if any increase is warranted." We believe the trial court's decision was based upon Peter's testimony that once he pays off an $18,000 balloon payment and a monthly computer debt of $461 in March 2001, his income would go up. While reserving jurisdiction over a spousal support award only to potentially increase the award is unorthodox, we cannot say that it constitutes an abuse of discretion.